UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF

WEST VIRGINIA

BLUEFIELD DIVISION

FILED
JUN - 7 2013
TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

| | |
|---|---|
| TERRENCE SHEPHERD | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) C.A. NO. 1:13-13757 |
| | ) |
| REX BLOCKER | ) |
| WILLIAM GOODE | ) |
| CARL HILL | ) |
| KAREN F. HOGSTEN | ) |
| HIPPILTO MATOS | ) |
| MS. RYAN | ) |
| Defendants | ) |

IN THEIR OFFICIAL AND

INDIVIDUAL CAPACITIES

## COMPLAINT

1. This is an action to redress the violations of the Plaintiff's rights under the Constitution of the United States and under the laws of the United States.

In this action Plaintiff seeks compensatory damages, punitive damages, attorney fees all incurred court cost and trial by jury.

## JURISDICTION

2. This court has jurisdiction pursuant to Title 28 U.S.C. §§ 1331 and 1346(b).

## PARTIES

3. Plaintiff Terrence Shepherd is a federal prisoner currently incarcerated at the Federal Correctional Institution(FCI) Edgefield.

4. Defendant Rex Blocker, is a Medical Doctor and the Clinical Director presently employed at FCI Edgefield; William Goode, is a Physician's Assistant(PA) presently employed at FCI McDowell; Carl Hill, is a PA presently employed at FCI McDowell; Karen Hogsten, is the Warden at FCI McDowell; Hippilito Matos, ia a Medical Doctor and the Clinical Director presently employed at FCI McDowell; Ms.Ryan, was a PA previously employed at FCI Edgefield.

## FACTS

5. On September 21,2011, Terrence Shepherd(herein after) Plaintiff reported to sickcall at the Medical Services at FCI McDowell. He had an appointment to see Defendant PA Goode. Plaintiff complained of a recent injury to his right knee while playing softball at FCI McDowell. He specifically complained of pain, swelling, and locking of his right knee when he walked. An x-ray was ordered for that day.

6. Some (17) days later, on October 7, 2011, Plaintiff received the x-ray. The x-ray report stated that the x-ray was negative, except for joint effusion and mild pre-patellar soft tissue swelling.

7. On October 21,2011, during a chronic care visit with Defendant Dr.Matos, the Clinical Director, Plaintiff once

-2-

again complained about the pain in his right and that the knee was locking when he walked.

8. On December 22, 2011 Plaintiff was scheduled to have an appointment with Defendant PA Hill. However, Plaintiff was unable to appear for his scheduled appointment, as all inmates at FCI McDowell were locked in their cell until after the 4:00 PM Count. This lock-down was due to the fact that staff were attending a Christmas Party within the McDowell Institution. Oddly, Defendant Hill stated that Plaintiff failed to show up for his scheduled appointment in spite of the fact that he and all other inmates were locked in their cells.

9. On December 27, 2011, Plaintiff once again signed up for sick-call, to complain of the pain and suffering he was experiencing due to the problem with his knee. Plaintiff was not seen.

10. On January 31, 2012, Defendant PA Goode wrote a consult for plaintiff to have an MRI. In spite of the fact that the MRI consult being written on January 31st, it was not brought before the Utilization Review Committee (URC) until some one month later on February 27, 2012. The URC approved that Plaintiff should have the MRI. However, Plaintiff was informed that before he could have the MRI, he had to have final approval from the Regional Doctor which was done on March 6, 2012. It should be noted that during all of this time, Plaintiff was experiencing pain and anguish.

11. On February 24, 2012, while the above situation in the above paragraph was playing out, Plaintiff had a scheduled

-3-

appointment with Defendant PA Hill to address the issue Plaintiff's right knee complaints. He informed Defendant Hill of the pain he was experiencing when he walked. Defendant Hill examined Plaintiff's knee and noted the swelling, tenderness, and the clicking in his knee. He also noted the fact that Plaintiff was limping.

12. On March 16, 2012, Plaintiff had a follow-up visit with Defendant Hill, wherein Plaintiff once again complained about the pain and swelling in his knee.

13. On April 4, 2012, Plaintiff had a chronic care appointment with Defendant Dr.Matos. During this chronic care examination, Plaintiff once again complained about the pain in his right knee. Defendant Matos even bent Plaintiff's leg to ascertain the limit that hid knee could be moved before he felt pain.

14. On April 9, 2012, Plaintiff went to Princeton Community Hospital to have the MRI which was approved on March 6, 2012 by the Regional Doctor. See ¶ 10.

15. On April 26, 2012, Plaintiff sent an email to the Medical Records Technician requesting a copy of the MRI report from his right knee.

16. On May 2, 2012, Plaintiff received a copy of the MRI report. This report stated that Plaintiff had a healed avulsion fracture in his lateral femoral condyle, associated with a partial tear of the proximal attachment of his lateral collateral ligament. Plaintiff also had mild irregular articular thinning in the central portions of both his femoral condyles.

17. On May 3, 2012, Plaintiff had a follow-up appointment

with Defendant PA Hill. Plaintiff requested to discuss the results of the recent MRI of his right knee. Defendant Hill's assessment was Plaintiff had an acute enthesopathy of his knee. Hill informed Plaintiff that he recommends that Plaintiff receives physical therapy to rehabilitate his knee. Thus, Defendant Hill wrote the consult.

18. On May 11, 2012, Plaintiff was called to the Medical Department by Defendant Hill. Defendant Hill informed Plaintiff that he (Hill) had spoken to Defendant Dr. Matos about Plaintiff's knee condition and Dr. Matos agreed with the treatment plan recommended by Defendant Hill, that Plaintiff should receive physical therapy. Defendant Hill also informed Plaintiff that he would not be receiving an orthopedic consult.

19. On July 18, 2012, Plaintiff was transferred from FCI McDowell and arrived at FCI Edgefield on August 8, 2012.

20. On August 9, 2012, Plaintiff signed up for sick-call at FCI Edgefield and was scheduled to see Defendant PA Ryan on August 13, 2012.

21. On August 13, 2012, Defendant Ryan wrote a consultation request for Plaintiff to see an orthopedist. Defendant Ryan also informed Plaintiff that Defendant Hill's request that Plaintiff receive physical therapy was denied on May 17, 2012 by the URC. Strangely, this physical therapy request that was denied is the same physical therapy that Defendant Hill had informed Plaintiff that Defendant Matos had agreed to. See ¶ 18.

22. Even stranger is the fact that during the last week of

-5-

May 2012, a code 339 transfer request was generated to transfer Plaintiff from FCI McDowell. Plaintiff was approved and redesignated by the Designation and Sentence Computation Center(DSCC) on August 2, 2012.

23. A code 339 transfer request is used when there is an increase in an inmates care level from a "one to a two." However, if Plaintiff as to receive physical therapy as he was informed, then a code 331 transfer was supposed to be generated, as physical therapy is normally limited to inmates at medical referral centers, which require an inmate to have a care level of four. In this instance, it was never intended that Plaintiff receive physical therapy. Although Plaintiff was continually misled to believe he would be receiving physical therapy, it was nothing but a ploy to get Plaintiff and his complaining about his knee out of the Administration and Medical Department's hair. Even the Warden of FCI McDowell, Defendant Hogsten, got into the act of misleading Plaintiff that he would be receiving physical therapy, stating: "The PA saw you on May 3, 2012, and explained the results of your recent MRI with you and wrote a consult for physical therapy. Due to physical therapy not being available at a care level one facility, your care level has been increased to a care level two and you will be put in for a transfer where this service can be provided. The PA (Defendant Hill) and the Clinical Director (Defendant Matos) concluded that according to the MRI your injuries are healed and there is no indication to see an orthopedist." This written statement from Warden Hogsten was written on June 15, 2012, almost one month after the consult for physical

physical therapy was denied. Also see ¶¶ 24 and 26.

24. On October 10, 2012 Plaintiff finally had a consult with an orthopedist, one Dr. Douglas E. Holford, within the FCI Edgefield institution. During the physical examination of Plaintiff's right knee, Dr. Holford noted "he (Plaintiff) does have positive posterolateral sign with increased recurvatum to his knee. He does have positive posterolateral drawer test." Also Dr. Holford's impression was that Plaintiff "suffers from posterolateral rotatory instability". Dr. Holford further noted that the particular instability in Plaintiff's knee is difficult to treat surgically. Dr. Holford informed Plaintiff, in the presence of the Assistant Health Service Administrator (AHSA) Mr. Guerara, the following factors which makes the Plaintiff's injuries difficult to surgically treat: (1) the uncommonness of the particular injury; (2) Plaintiff LCL has lost its normal elasticity and the torn portion of the ligament is in thin shreds, if he [Dr. Holford] tried to use stitches to reattach the LCL back to the point of the femur in which it tore from it may not hold.

25. As noted in paragraph 23, Defendants Hill and Matos concluded that according to Plaintiff's MRI his injuries are healed.
Thus, they saw no indication for Plaintiff to have an orthopedic consult. Clearly these Defendants are guilty of doctoring, at its' worst.

26. On October 10, 2012 the orthopedist Dr. Holford recommended that Plaintiff receive and wear an ACL type brace to prevent Plaintiff from further injuring his knee.

Dr. Holford stated: "He needs to have his extension blocked at about 5-degrees. That will prevent the hyperextension problems". Plaintiff did not receive this special brace until February 13, 2013.

27. Since the consult with Dr. Holford on October 10, 2012, Plaintiff has signed up for sick-call five times: On November 2, 2012; December 20, 2012; January 4, 2013; January 10 and 11, 2013. Plaintiff went to sick-call on these occasions to complain about the continued pain and the feeling of instability in his knee. In spite of the pain and instability in his knee, Plaintiff has yet to see any medical staff. In fact, the last two times Plaintiff signed up for sick-call on January 10th and 11th, Plaintiff complained about re-injuring his knee, informing Defendant Ryan that he [Plaintiff] had hyper-extended his Knee twice trying to exercise it as Defendant Ryan had instructed him to do. Plaintiff informed Defendant Ryan that he was in extreme pain and that his knee was swollen and that he could not bend it. Defendant Ryan told Plaintiff to watch the call-outs. Plaintiff informed Defendant Ryan that he had signed up to be seen by medical staff four previous times, but has yet to be seen. Defendant Ryan told Plaintiff "I can make you wait until your chronic care appointment before I see you." Defendant Ryan then told Plaintiff to leave the medical department.

28. On January 17, 2013, Plaintiff was seen by Defendant PA Ryan. During this examination his blood pressure was taken. His blood pressure was 160/95.

-8-

Defendant Ryan asked Plaintiff why his blood pressure was so high and whether he had been taking his medication. Plaintiff explained that he had not been able to exercise even moderately due to the pain and instability in his knee. Hence, that may be the reason his blood pressure was so high. Defendant Ryan stated: "I'm going to have to look into increasing your meds." Oddly, Defendant Ryan totally disregarded Plaintiff's statement as to the pain and instability in his knee. Nor did Defendant Ryan bother to examine his knee. However, although failing to examine Plaintiff's knee, Ryan informed him not to do any running and to wait for the knee brace to come in and to wear it and the brace would heal the knee injury. See ¶ 26.

29. On January 22, 2013 Plaintiff sent an e-mail to the Health Service Administrator (HSA) Mrs. Rosario. He informed her of the continuing problem he was having trying to get Defendant PA Ryan to deal with his knee injury. Plaintiff requested to be seen by a doctor to reevaluate his knee. Mrs. Rosario Replied to Plaintiff's e-mail on February 21, 2013 stating: [Your] "e-mail will be forwarded to the Clinical Director for review and if appropriate for scheduling an appointment". As of the present date, Plaintiff has not been scheduled to see the Clinical Director, Defendant Dr. Blocker, nor has Dr. Blocker contacted him.

30. On February 13, 2013, Plaintiff was called to the Health Services Department by the AHSA Mr. Guevara and was issued the knee brace. See ¶ 26. Also present was the orthopedist Dr. Holford, who prescribed the knee brace. Plaintiff

informed Dr.Holford that his knee was still giving him numerous problems, and that he(Plaintiff) had hyper-extended it twice since his last appointment some (4) months previous. Plaintiff requested that Dr.Holford examine his knee, which he did. Dr.Holford informed Plaintiff that he still had the same instability in his knee--- posterolateral rotatory instability.

31. On February 21,2013, Plaintiff submitted an administrative remedy grievance (BP-9) to Warden Atkinson of FCI Edgefield. Plaintiff informed Mr.Atkinson of the continuing problems that he was experiencing with his knee, and the problems with getting adequate medical care for his injury. Further,he(Plaintiff) requested to be appointed a different PA than Defendant Ryan, as Plaintiff feared further medical mismanagement of his health care and retaliatory acts on her part. Further, Plaintiff requested to be allowed a second opinion as to the surgical treatment on his knee, and/or to be transferred to a federal medical facility that could better provide medical treatment for his knee.

32. On March 15 ,2013, Plaintiff received a response to the BP-9 that he submitted to Warden Atkinson. In his response, the Warden stated: (1)"[Plaintiff] was advised that surgery was not medically necessary at this time, and continued use of his knee brace was recommended", (2)"[Plaintiff] would not be reassigned a new PA", and (3) "[Plaintiff] was receiving appropriate medical care for his needs, and a transfer to a medical facility is not deemed necessary at this time".

-10-

33. On or about March 27, 2013 Plaintiff received copies of his medical records that he had previously requested. In these records there was a report from the date of February 13, 2013 when Plaintiff was seen by orthopedist Dr. Holford, where AHSA Guevara was present. At that time, Dr. Holford, after examining Plaintiff, diagnosed Plaintiff as still having posterolateral rotatory instability in his knee. However, in his written report of the date of February 13, 2013, Dr. Holford falsely stated that he informed Plaintiff that surgical intervention was not needed. Here, Dr. Holford's new diagnoses is indeed strange. Approximately (4) months earlier on October 10, 2012, Dr. Holford stated that Plaintiff's condition was difficult to treat surgically and recommended that Plaintiff be given an ACL type brace wherefore the hyperextension would be prevented. However, as noted on February 13, 2013, the day Plaintiff received this ACL type brace, Dr. Holford perfects a report stating that surgery is not necessary—as if by some miracle Plaintiff's knee was all of a sudden cured.

FIRST CAUSE OF ACTION

34. The facts set out in paragraphs; 6,7,8,9,10,11,12,13,27,28,28 and 32, violated Plaintiff's rights under the Eighth Amendment.

35. The named Defendant in the in the above paragraphs violated Plaintiff's Eighth Amendment rights when they allowed him to suffer pain and anguish in his knee needlessly.

SECOND CAUSE OF ACTION

36. The facts set out in paragraphs:

-11-

6,7,8,9,11,12,18,23,25,27,28,29, and 32 subjected Plaintiff to medical malpractice and medical negligence.

37. The named Defendants in the above paragraphs subjected the Plaintiff to medical malpractice and medical negligence as they acted outside of the actions of other health care professionals in their field and was the proximate cause of the physical impairment and medical anguish Plaintiff shall suffer for the rest of his life.

## DAMAGES

38. The Defendants made a mistake when they violated the Plaintiff's Constitutional rights and subjected him to medical malpractice and medical negligence.

Wherefore, the Plaintiff demands judgment against the Defendants and Prays the court grant the following relief:

A.  Compensatory damages of $200,000.00 (two hundred thousand dollars) for the pain, suffering and mental anguish and injuries to the quality of life Plaintiff will experience. The compensatory damages are to be joint and several.

B.  Punitive damages of $250,000.00, two hundred and fifty thousand dollars, to deter the defendants and others from committing similar acts in the future.

C.  All attorney fees and incurred court cost.

D.  Such other relief that the court may deem appropriate and equitable.

This action is filed in the interest of justice, in the spirit of the law and is not frivolous and is filed in good faith.

Date 6-4-13                                                          *[signature]*

                                                                     Terrence Shepherd

                                                                     Reg. No. 04147-007

                                                                     FCI Edgefield

                                                                     P.O. Box 725

                                                                     Edgefield, SC 29824

