**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

TERRENCE SHEPHERD,                          )
                                            )
             **Plaintiff,**          )
**v.**                                      )          **Civil Action No. 1:13-13757**
                                            )
REX BLOCKER, *et al.*,                      )
                                            )
             **Defendants.**         )

## PROPOSED FINDINGS AND RECOMMENDATION

On June 7, 2013, Plaintiff filed an Application to Proceed Without Prepayment of Fees and Complaint seeking relief pursuant to Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, and for alleged violations of his constitutional and civil rights pursuant to Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971). (Document Nos. 1 and 2.) In his Complaint, Plaintiff names the following as defendants: (1) Dr. Rex Blocker, Clinical Director at FCI Edgefield; (2) William Goode, Physician Assistant at FCI McDowell; (3) Carl Hill, Physician Assistant at FCI McDowell; (4) Karen Hogsten, Warden at FCI McDowell; (5) Dr. Hippilito Matos, Clinical Director at FCI McDowell; and (6) Ms. Ryan, Physician Assistant previously employed at FCI Edgefield. (Document No. 2, p. 2.) Having considered Plaintiff's claims upon screening under 28 U.S.C. § 1915A, the undersigned has determined that Plaintiff's claims against Defendants Blocker and Ryan should be dismissed for lack of personal jurisdiction and this matter should be referred back to the undersigned for further proceedings upon Plaintiff's claims against the remaining Defendants.

## PROCEDURAL AND FACTUAL BACKGROUND

In his Complaint, Plaintiff alleges that Defendants acted with negligence and deliberate

indifference in providing treatment for his knee injury.[1] (Document No. 2.) During his incarceration at FCI McDowell, Plaintiff claims that he injured knee while playing softball. (Id.) Plaintiff states that he reported to sick call on September 21, 2011, complaining of "pain, swelling, and locking of his right knee when he walked." (Id.) Plaintiff states that he was evaluated by PA Goode and "an x-ray was ordered for that day." (Id.) Plaintiff complains that the x-ray was conducted 17 days later, on October 7, 2011. (Id.) Plaintiff acknowledges that the "x-ray was negative, except for joint effusion and mild pre-patellar soft tissue swelling." (Id.) During a Chronic Care visit with Dr. Matos on October 21, 2011, Plaintiff states that he "complained about the pain in his right knee and that the knee was locking when he walked." (Id., pp. 2 - 3.) Plaintiff was then scheduled to have an appointment with PA Hill on December 22, 2013, but "Plaintiff was unable to appear for his scheduled appointment" due to a lock-down. (Id., p. 3.) Plaintiff alleges that even though he "signed up for sick-call" on December 27, 2011, he was not seen by medical staff. (Id.) Plaintiff acknowledges that on January 31, 2012, PA Goode "wrote a consult for Plaintiff to have an MRI." (Id.) Plaintiff, however, complains that the MRI consult "was not brought before the Utilization Review Committee ["URC"] until one month later, on February 27, 2012." (Id.) Although the URC approved the MRI, Plaintiff complains that final approval was not obtained from the Regional Doctor until March 6, 2012. (Id.)

Plaintiff acknowledges that he was evaluated by PA Hill on February 24, 2012 and March 16, 2012. (Id., pp. 3 - 4.) During his Chronic Care appointment on April 4, 2012, Plaintiff alleges that he informed Dr. Matos of the continued pain in his right knee. (Id., p. 4.) Plaintiff's MRI was

---

[1] Because Petitioner is acting *pro se*, the documents which he has filed are held to a less stringent standard than if they were prepared by a lawyer and therefore construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

conducted on April 9, 2012, at the Princeton Community Hospital. (Id.) Plaintiff complains that he did not receive a copy of his MRI report until May 2, 2012. (Id.) Plaintiff contends that the MRI report "stated that Plaintiff had a healed avulsion fracture in his lateral femoral condyle, associated with a partial tear of the proximal attachment of his lateral collateral ligament; . . . mild irregular articular thinning in the central portions of both his femoral condyles." (Id.) Plaintiff had a follow-up appointment with PA Hill on May 3, 2012. (Id., pp. 4 - 5.) PA Hill allegedly informed Plaintiff that he "had an acute enthesopathy of his knee" and recommended that "Plaintiff receive physical therapy to rehabilitate his knee." (Id.) Plaintiff alleges that on May 11, 2012, PA Hill informed Plaintiff that Dr. Matos "agreed with the treatment plan . . . that Plaintiff should receive physical therapy." (Id., p. 5.) Plaintiff further alleges that PA Hill informed him that an orthopedic consult was unnecessary. (Id.)

On July 18, 2012, Plaintiff was transferred from FCI McDowell. (Id.) Plaintiff arrived at FCI Edgefield on August 8, 2012. (Id.) Following his sick call request, Plaintiff was evaluated by PA Ryan on August 13, 2012. (Id.) Plaintiff states that PA Ryan "wrote a consultation request for Plaintiff to see an orthopedist" and informed Plaintiff that PA Hill's "request that Plaintiff receive physical therapy was denied on May 17, 2012, by the URC." (Id.) Plaintiff contends that the "physical therapy request that was denied is the same physical therapy that Defendant Hill had informed Plaintiff that Defendant Matos had agreed to." (Id.) Plaintiff explains that "a code 339 transfer request was generated to transfer Plaintiff from FCI McDowell" and "[a] code 339 transfer request is used when there is an increase in an inmate's care level from 'one to a two.'" (Id., p. 6.) Plaintiff alleges that a "code 331 transfer was supposed to be generated as physical therapy is normally limited to inmates at medical referral centers, which requires an inmate to have a care level

of four." (Id.) Plaintiff, therefore, contends that Defendants "never intended that Plaintiff receive physical therapy." (Id.) Plaintiff claims that "it was nothing but a ploy to get Plaintiff and his complaining about his knee out of the Administration and Medical Department's hair." (Id.)

Plaintiff alleges that he was evaluated by an orthopedist, Dr. Douglas E. Holford, on October 10, 2012. (Id., p. 7.) Plaintiff states that Dr. Holford noted as follows: "he does have positive posterolateral sign with increased recurvatum to his knee. He does have positive posterolateral drawer test. . . [Plaintiff] suffers from posterolateral rotatory instability." (Id.) Dr. Holford allegedly informed Plaintiff and Assistant Health Service Administrator Guerara, that Plaintiff's condition was difficult to treat surgically based on the following: "(1) the uncommonness of the particular injury; (2) Plaintiff's LCL has lost its normal elasticity and the torn portion of the ligament is in thin shreds, if he (Dr. Holford) tried to use stitches to reattach the LCL back to the point of the femur in which it tore, it may not hold." (Id.) Additionally, Dr. Holford further recommended that "Plaintiff receive and wear an ACL type brace to prevent Plaintiff from further injuring his knee." (Id.) Plaintiff alleges that the foregoing proves that PA Hill and Dr. Matos acted with negligence and deliberate indifference because they concluded that Plaintiff's injuries were healed and there was "no indication for Plaintiff to have an orthopedic consult." (Id.)

Plaintiff further claims that he signed up for sick-call on November 2, 2012, December 20, 2012, January 4, 2013, January 10, 2013, and January 11, 2013, but was never seen by "any medical staff." (Id.) Plaintiff explains that he informed PA Ryan on January 10 and 11, 2013, that he had hyper-extended his knee causing him to suffer extreme pain and the inability to bend his knee. (Id.) Plaintiff alleges that PA Ryan instructed him to "watch the call-outs." (Id.) Plaintiff states that he was evaluated by PA Ryan on January 17, 2013, and "his blood pressure was 160/95." (Id.) Plaintiff

4

alleges that he explained to PA Ryan that his blood pressure was high due to his inability "to exercise even moderately due to pain and instability in his knee." (Id.) Plaintiff complains that PA Ryan focused on changing Plaintiff's blood pressure medications instead of addressing the pain and instability of his knee. (Id.)

Plaintiff alleges that he e-mailed the Health Service Administrator, Mrs. Rosario, on January 22, 2013, complaining of PA Ryan's failure to address his knee problem. (Id., p. 9.) Plaintiff states that Mrs. Rosario replied to his e-mail on February 21, 2013, stating that Plaintiff's "e-mail will be forwarded to the Clinical Director for review and if appropriate for scheduling an appointment." (Id.) Plaintiff complains that "[a]s of the present date, Plaintiff has not been scheduled to see the Clinical Director, Defendant Dr. Blocker, nor has Dr. Blocker contacted him." (Id.)

Plaintiff acknowledges that on February 13, 2013, he "was called to the Health Services Department by the AHSA Mr. Guevara and was issued the knee brace." (Id.) Plaintiff complains that he did not receive he knee brace until approximately four months after his appointment with Dr. Holford. (Id., pp. 8 and 9.) Plaintiff states that Dr. Holford was present at his February 13, 2013, appointment and Plaintiff informed Dr. Holford that he was continuing to have problems and had "hyperextended it twice since his last appointment." (Id., p. 10.) Plaintiff states that Dr. Holford examined his knee and "informed Plaintiff that he still had the same instability in his knee - - posterolateral rotatory instability." (Id.) Plaintiff asserts that he subsequently received a copy of Dr. Holford's written report concerning his evaluation of Plaintiff on February 13, 2013. (Id., p. 11.) Plaintiff alleges that Dr. Holford's written report "falsely stated that he informed Plaintiff that surgical intervention was not needed." (Id.) Plaintiff asserts that the report contains false information because "[a]pproximately 4 month earlier on October 10, 2012, Dr. Holford stated that Plaintiff's

5

condition was difficult to treat surgically and recommended that Plaintiff be given an ACL type brace wherefore the hyperextension would be prevented." (Id.) Plaintiff contends that Dr. Holford's report dated February 13, 2013, indicates that "surgery is not necessary – as if by some miracle Plaintiff's knee was all of a sudden cured." (Id.) Based on the foregoing, Plaintiff requests monetary relief. (Id., p. 12.)

## ANALYSIS

Plaintiff asserts claims against Defendants Blocker and Ryan, who are not residents of the State of West Virginia. Two conditions must be satisfied for a district court to assert personal jurisdiction over a non-resident defendant: (1) A state long-arm jurisdiction statute must authorize jurisdiction over the non-resident defendant; or (2) The court's exercise of personal jurisdiction over the non-resident defendant must "comport with the Due Process Clause." Mylan Lab, Inc. v. Akzo, N.V., 2 F.3d 56, 59-60 (4th Cir. 1993); In re Celotex Corp., 124 F.3d 619, 627 (4th Cir. 1997). Since "the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary in this case to go through the normal two-step formula for determining the existence of personal jurisdiction." In re Celotex Corp., 124 F.3d at 627-28(citation omitted); also see York v. Property and Casualty Ins. Co. of Hartford, 2013 WL 5504435 (S.D.W.Va. Oct. 3, 2013)("the statutory inquiry mergers with the constitutional inquiry, and the two inquires essentially become one.) Therefore, the court's inquiry centers on whether the exercise of personal jurisdiction over the non-resident defendant is consistent with the Due Process Clause.

It is well established that the exercise of personal jurisdiction over the non-resident defendant is consistent with the Due Process Clause "if the defendant has sufficient 'minimum contacts' with the forum such that requiring the defendant to defend its interests in the forum does

not 'offend traditional notions of fair play and substantial justice.'" In re Celotex Corp., 124 F.3d at 628(quoting International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). When assessing the "minimum contacts," courts should consider whether the defendant's contacts with the forum also provides the basis for the suit. Carefirst, 334 F.3d at 397. If the defendant's contact with the forum state provides the basis for the suit, courts may exercise what is known as "specific jurisdiction." Id. To determine whether specific jurisdiction exists, the Court should consider the following: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" Id. If the defendant's contact with the forum state does not provide the basis for the suit, a court may only exercise "general jurisdiction." Id. General jurisdiction is appropriate only where the defendant's contacts with the forum are "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

Defendants Blocker and Ryan are employees at FCI, Edgefield, which is located in South Carolina. All of the allegations against Defendants Blocker and Ryan occurred in South Carolina. Plaintiff fails to allege any type of contact between the State of West Virginia and these defendants. Accordingly, Plaintiff's claims against Defendants Blocker and Ryan should be dismissed because this Court lacks personal jurisdiction.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District

Court **DISMISS** Plaintiff's claims against Defendants Blocker and Ryan and **REFER** this matter back to the undersigned for further proceedings upon Plaintiff's FTCA and <u>Bivens</u> claims against the remaining Defendants.

Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, Plaintiff shall have seventeen (17) days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, District Judge Berger and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*.

Date: February 25, 2014.

R. Clarke VanDervort
United States Magistrate Judge