**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **TERRENCE SHEPHERD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 1:13-13757** |
| | ) | |
| **REX BLOCKER**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court are the following Motions: (1) The United States' "Motion to Dismiss Plaintiff's FTCA Claim" (Document No. 25.), filed on April 11, 2014; and (2) Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Document No. 35.), filed on May 23, 2014. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants. (Document Nos. 30 and 37.) On May 5, 2014, and July 2, 2014, Plaintiff filed his Response in Opposition to Defendants' Motions. (Document Nos. 32, 41 and 42.)

**PROCEDURAL AND FACTUAL BACKGROUND**

On June 7, 2013, Plaintiff filed an Application to Proceed Without Prepayment of Fees and Complaint seeking relief pursuant to the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, and for alleged violations of his constitutional and civil rights pursuant to Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971). (Document Nos. 1 and 2.) In his Complaint, Plaintiff names the following as defendants: (1) Dr. Rex Blocker, Clinical Director at FCI Edgefield; (2) William Goode, Physician Assistant at

FCI McDowell; (3) Carl Hill, Physician Assistant at FCI McDowell; (4) Karen Hogsten, Warden at

FCI McDowell; (5) Dr. Hippilito Matos, Clinical Director at FCI McDowell; and (6) Ms. Ryan,

Physician Assistant previously employed at FCI Edgefield. (Document No. 2, p. 2.) Plaintiff alleges

that Defendants acted with negligence and deliberate indifference in providing treatment for his knee

injury.[1] (Id.) During his incarceration at FCI McDowell, Plaintiff claims that he injured his knee

while playing softball. (Id.) Plaintiff states that he reported to sick call on September 21, 2011,

complaining of "pain, swelling, and locking of his right knee when he walked." (Id.) Plaintiff states

that he was evaluated by PA Goode and "an x-ray was ordered for that day." (Id.) Plaintiff complains

that the x-ray was conducted 17 days later, on October 7, 2011. (Id.) Plaintiff acknowledges that the

"x-ray was negative, except for joint effusion and mild pre-patellar soft tissue swelling." (Id.) During

a Chronic Care visit with Dr. Matos on October 21, 2011, Plaintiff states that he "complained about

the pain in his right knee and that the knee was locking when he walked." (Id., pp. 2 - 3.) Plaintiff

was then scheduled to have an appointment with PA Hill on December 22, 2013, but "Plaintiff was

unable to appear for his scheduled appointment" due to a lock-down. (Id., p. 3.) Plaintiff alleges that

even though he "signed up for sick-call" on December 27, 2011, he was not seen by medical staff.

(Id.) Plaintiff acknowledges that on January 31, 2012, PA Goode "wrote a consult for Plaintiff to

have an MRI." (Id.) Plaintiff, however, complains that the MRI consult "was not brought before the

Utilization Review Committee ["URC"] until one month later, on February 27, 2012." (Id.) Although

the URC approved the MRI, Plaintiff complains that final approval was not obtained from the

Regional Doctor until March 6, 2012. (Id.)

---

[1]  Because Petitioner is acting *pro se*, the documents which he has filed are held to a less
stringent standard than if they were prepared by a lawyer and therefore construed liberally. *See
Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Plaintiff acknowledges that he was evaluated by PA Hill on February 24, 2012 and March 16, 2012. (Id., pp. 3 - 4.) During his Chronic Care appointment on April 4, 2012, Plaintiff alleges that he informed Dr. Matos of the continued pain in his right knee. (Id., p. 4.) Plaintiff's MRI was conducted on April 9, 2012, at the Princeton Community Hospital. (Id.) Plaintiff complains that he did not receive a copy of his MRI report until May 2, 2012. (Id.) Plaintiff contends that the MRI report "stated that Plaintiff had a healed avulsion fracture in his lateral femoral condyle, associated with a partial tear of the proximal attachment of his lateral collateral ligament; . . . mild irregular articular thinning in the central portions of both his femoral condyles." (Id.) Plaintiff had a follow-up appointment with PA Hill on May 3, 2012. (Id., pp. 4 - 5.) PA Hill allegedly informed Plaintiff that he "had an acute enthesopathy of his knee" and recommended that "Plaintiff receive physical therapy to rehabilitate his knee." (Id.) Plaintiff alleges that on May 11, 2012, PA Hill informed Plaintiff that Dr. Matos "agreed with the treatment plan . . . that Plaintiff should receive physical therapy." (Id., p. 5.) Plaintiff further alleges that PA Hill informed him that an orthopedic consult was unnecessary. (Id.)

On July 18, 2012, Plaintiff was transferred from FCI McDowell. (Id.) Plaintiff arrived at FCI Edgefield on August 8, 2012. (Id.) Following his sick call request, Plaintiff was evaluated by PA Ryan on August 13, 2012. (Id.) Plaintiff states that PA Ryan "wrote a consultation request for Plaintiff to see an orthopedist" and informed Plaintiff that PA Hill's "request that Plaintiff receive physical therapy was denied on May 17, 2012, by the URC." (Id.) Plaintiff contends that the "physical therapy request that was denied is the same physical therapy that Defendant Hill had informed Plaintiff that Defendant Matos had agreed to." (Id.) Plaintiff explains that "a code 339 transfer request was generated to transfer Plaintiff from FCI McDowell" and "[a] code 339 transfer request is used when there is an increase in an inmate's care level from 'one to a two.'" (Id., p. 6.)

Plaintiff alleges that a "code 331 transfer was supposed to be generated as physical therapy is normally limited to inmates at medical referral centers, which requires an inmate to have a care level of four." (Id.) Plaintiff, therefore, contends that Defendants "never intended that Plaintiff receive physical therapy." (Id.) Plaintiff claims that "it was nothing but a ploy to get Plaintiff and his complaining about his knee out of the Administration and Medical Department's hair." (Id.)

Plaintiff alleges that he was evaluated by an orthopedist, Dr. Douglas E. Holford, on October 10, 2012. (Id., p. 7.) Plaintiff states that Dr. Holford noted as follows: "he does have positive posterolateral sign with increased recurvatum to his knee. He does have positive posterolateral drawer test. . . [Plaintiff] suffers from posterolateral rotatory instability." (Id.) Dr. Holford allegedly informed Plaintiff and Assistant Health Service Administrator Guerara, that Plaintiff's condition was difficult to treat surgically based on the following: "(1) the uncommonness of the particular injury; (2) Plaintiff's LCL has lost its normal elasticity and the torn portion of the ligament is in thin shreds, if he (Dr. Holford) tried to use stitches to reattach the LCL back to the point of the femur in which it tore, it may not hold." (Id.) Additionally, Dr. Holford further recommended that "Plaintiff receive and wear an ACL type brace to prevent Plaintiff from further injuring his knee." (Id.) Plaintiff alleges that the foregoing proves that PA Hill and Dr. Matos acted with negligence and deliberate indifference because they concluded that Plaintiff's injuries were healed and there was "no indication for Plaintiff to have an orthopedic consult." (Id.)

Plaintiff further claims that he signed up for sick-call on November 2, 2012, December 20, 2012, January 4, 2013, January 10, 2013, and January 11, 2013, but was never seen by "any medical staff." (Id.) Plaintiff explains that he informed PA Ryan on January 10 and 11, 2013, that he had hyper-extended his knee causing him to suffer extreme pain and the inability to bend his knee. (Id.) Plaintiff alleges that PA Ryan instructed him to "watch the call-outs." (Id.) Plaintiff states that he was

4

evaluated by PA Ryan on January 17, 2013, and "his blood pressure was 160/95." (Id.) Plaintiff alleges that he explained to PA Ryan that his blood pressure was high due to his inability "to exercise even moderately due to pain and instability in his knee." (Id.) Plaintiff complains that PA Ryan focused on changing Plaintiff's blood pressure medications instead of addressing the pain and instability of his knee. (Id.)

Plaintiff alleges that he e-mailed the Health Service Administrator, Mrs. Rosario, on January 22, 2013, complaining of PA Ryan's failure to address his knee problem. (Id., p. 9.) Plaintiff states that Mrs. Rosario replied to his e-mail on February 21, 2013, stating that Plaintiff's "e-mail will be forwarded to the Clinical Director for review and if appropriate for scheduling an appointment." (Id.) Plaintiff complains that "[a]s of the present date, Plaintiff has not been scheduled to see the Clinical Director, Defendant Dr. Blocker, nor has Dr. Blocker contacted him." (Id.)

Plaintiff acknowledges that on February 13, 2013, he "was called to the Health Services Department by the AHSA Mr. Guevara and was issued the knee brace." (Id.) Plaintiff complains that he did not receive the knee brace until approximately four months after his appointment with Dr. Holford. (Id., pp. 8 and 9.) Plaintiff states that Dr. Holford was present at his February 13, 2013, appointment and Plaintiff informed Dr. Holford that he was continuing to have problems and had "hyperextended it twice since his last appointment." (Id., p. 10.) Plaintiff states that Dr. Holford examined his knee and "informed Plaintiff that he still had the same instability in his knee - - posterolateral rotatory instability." (Id.) Plaintiff asserts that he subsequently received a copy of Dr. Holford's written report concerning his evaluation of Plaintiff on February 13, 2013. (Id., p. 11.) Plaintiff alleges that Dr. Holford's written report "falsely stated that he informed Plaintiff that surgical intervention was not needed." (Id.) Plaintiff asserts that the report contains false information because "[a]pproximately 4 month earlier on October 10, 2012, Dr. Holford stated that Plaintiff's

5

condition was difficult to treat surgically and recommended that Plaintiff be given an ACL type brace wherefore the hyperextension would be prevented." (Id.) Plaintiff contends that Dr. Holford's report dated February 13, 2013, indicates that "surgery is not necessary – as if by some miracle Plaintiff's knee was all of a sudden cured." (Id.) Based on the foregoing, Plaintiff requests monetary relief. (Id., p. 12.)

By Order entered on February 25, 2014, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees and ordered the Clerk to issue process upon Defendants Goode, Hill, Hogsten, and Matos upon receipt of Plaintiff's initial partial payment of the filing fee. (Document No. 6.) By Proposed Findings and Recommendation entered the same day, the undersigned recommended that Defendants Blocker and Ryan be dismissed because the Court lacked personal jurisdiction. (Document No. 7.) Plaintiff paid his initial partial payment of the filing fee on March 17, 2014, and the Clerk issued process. (Document Nos. 9 - 11.) By Memorandum Opinion and Order entered on March 20, 2014, United States District Judge Faber adopted the undersigned's recommendation and dismissed Plaintiff's claims against Defendants Blocker and Ryan. (Document No. 12.)

On April 1, 2014, the United States filed its "Motion to Substitute" and Memorandum in Support. (Document No. 17 and 18.) Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on April 2, 2014, advising him of the right to file a response to the United States' Motion. (Document No. 19.) On April 10, 2014, Plaintiff filed his Response stating that he had no objection to the United States' Motion. (Document No. 22.)

On April 11, 2014, the United States filed a "Motion to Dismiss Plaintiff's FTCA Claim" and Memorandum in Support. (Document Nos. 25 and 26.) The United States argues that Plaintiff's Complaint should be dismissed because "Plaintiff's claim of negligent medical care must be

dismissed for failure to comply with the West Virginia Medical Professional Liability Act." (Id.) Notice pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on April 15, 2014, advising him of the right to file a response to the United States' Motion. (Document No. 30.) On May 5, 2014, Plaintiff filed his Response in Opposition to the United States' Motion. (Document No. 32.)

On May 23, 2014, Defendants filed a "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 35 - 36.) Defendants argue that Plaintiff's Complaint should be dismissed based on the following: (1) "Defendant Hill was a Public Health Service Employee during the relevant times of the complaint and is therefore entitled to absolute immunity" (Document No. 36, pp. 12 - 13.); (2) "Plaintiff's claim against former Warden Hogsten does not allege a constitutional violation" (Id., pp. 13 - 15.); (3) "Medical Defendants were not deliberately indifferent to Plaintiff's serious medical needs" (Id., pp. 15 - 23.); and (4) "Defendants are entitled to qualified immunity" (Id., pp. 23 - 27.). Notice pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on May 27, 2014, advising him of the right to file a response to the Defendants' Motion. (Document No. 37.) On July 2, 2014, Plaintiff filed his Responses in Opposition to Defendants' Motion. (Document Nos. 41 and 42.)

## **<u>FACTUAL HISTORY</u>**

Based upon a review of Plaintiff's medical records, Plaintiff reported to Health Services on September 21, 2011, complaining of swelling, pain, and locking of the right knee. (Document No. 35-2, p. 7.) Plaintiff explained that he hyperextended his right knee while running on the track. (Id.) Plaintiff was examined by Physician Assistant ["PA"] William Goode, who noted that Plaintiff had full range of motion with some swelling, effusion, and crepitus. (Id.) PA Goode prescribed prednisone, ordered an x-ray, and instructed Plaintiff to follow-up at sick call as needed. (Id., p. 8.)

The x-ray was conducted on October 7, 2011, and revealed negative findings "except for small joint effusion and mild prepatellar soft tissue swelling." (<u>Id.</u>, p. 9.) During a chronic care appointment on October 21, 2011, Plaintiff continued to complain of right knee pain and was examined by Dr. Matos. (<u>Id.</u>, p. 11.) Dr. Matos reviewed Plaintiff's x-ray results, prescribed Indomethacin for 180 days for the inflammation and pain, and instructed Plaintiff to follow-up as needed. (<u>Id.</u>, pp. 11 - 13.) On December 22, 2011, Plaintiff failed to report for his sick-call appointment concerning his complain of swelling, pain, and locking of the right knee. (<u>Id.</u>, p. 15.)

By Administrative Note entered on January 31, 2012, PA Goode noted that Plaintiff had complained of right knee for last three months. (<u>Id.</u>, p. 16.) PA Goode submitted a consultation request to the Utilization Review Committee ["URC"] for an MRI of Plaintiff's right knee. (<u>Id.</u>) On February 24, 2012, Plaintiff was evaluated by PA Carl Hill for a follow-up appointment concerning his complaint of right knee pain. (<u>Id.</u>, p. 17.) Plaintiff stated that he twisted his right knee while playing softball and felt it "pop." (<u>Id.</u>) PA Hill examined Plaintiff noting that Plaintiff had a favoring gait with swelling, tenderness, and clicking of the right knee. (<u>Id.</u>, p. 18.) PA Hill noted that the MRI request was pending, and an orthopedic consult could be considered if the MRI was not approved. (<u>Id.</u>) Plaintiff was instructed to follow-up with sick call as needed. (<u>Id.</u>) On March 16, 2012, Plaintiff reported to Health Services for a follow-up appointment where he complained that he continued to have swelling and pain when attempting to run or play sports. (<u>Id.</u>, p. 19.) PA Hill examined Plaintiff noting that Plaintiff had a normal gait. (<u>Id.</u>) PA Hill further noted that he informed Plaintiff that the MRI request was pending regional approval. (<u>Id.</u>, p. 20.)

On April 4, 2012, Plaintiff was examined by Dr. Matos during a chronic care visit. (<u>Id.</u>, pp. 21 - 25.) Dr. Matos noted that Plaintiff had some tenderness when bending his right knee. (<u>Id.</u>, p. 23.) Dr. Matos further noted Plaintiff's lack of compliance with the prescribed medication for knee pain.

(Id., p. 21.) Dr. Matos instructed Plaintiff to continue the prescription for Indomethacin for knee pain and follow-up as needed. (Id., p. 21.) An MRI of Plaintiff's right knee was conducted on April 9, 2012. (Id., p. 26.) On April 17, 2012, an additional x-ray was conducted for comparison with the MRI. (Id., p. 29.) The x-ray was "negative except for: prominence of the prepatellar soft tissue; cannot exclude prepatellar bursitis – clinical correlation recommended." (Id., p. 31.) The MRI report dated April 19, 2012, indicated an "old healed avulsion fracture from the lateral aspect of the lateral femoral condyle associated with an old partial tear of the proximal aspect of the lateral collateral ligament," and "mild irregular articular cartilage thinning in the central portions of both femoral condyles." (Id., p. 26.)

On May 3, 2012, Plaintiff reported to Health Services because he had stopped taking his Lisinopril and wanted to discuss the results of his MRI. (Id., p. 47.) PA Hill discussed the MRI results with Plaintiff and recommended physical therapy for Plaintiff's right knee. (Id., p. 49.) On May 17, 2012, the URC denied PA Hill's request for physical therapy because FCI McDowell is a Care Level 1 facility in a remote location. (Id., p. 53.) Subsequently, Plaintiff's Care Level was increased to a Care Level 2 based upon his knee condition and high blood pressure. (Document No. 35-2, p. 3 and Document No. 35-3, pp. 54 and 56.) Plaintiff was transferred from FCI McDowell on July 19, 2012, and arrived at FCI Edgefield, a Care Level 2 facility, on August 8, 2012. (Document No. 35-3, p. 54.)

Plaintiff was evaluated by Health Services at FCI Edgefield on August 13, 2012, who noted that Plaintiff had hypertension and a previous knee injury. (Document No. 35-2, pp. 60 - 63.) PA Ryan directed that the Indomethacin be continued and requested an orthopedist consultation. (Id., p. 62.) PA Ryan noted that Plaintiff's request for physical therapy had previously been denied. (Id.) By Administrative Note entered on August 28, 2012, PA Ryan noted that Plaintiff was provided a knee brace. (Id., p. 65.) On September 6, 2012, the URC approved the orthopedist consultation request.

(Document No. 35-3, p. 1.) By Administrative Note entered on September 10, 2012, it was noted that Plaintiff was advised that the orthopedic consultation had been approved by the URC. (Id., p. 2.) On September 13, 2012, Plaintiff reported to Health Service for a patient education encounter where his BP-9 concerning his right knee problem was reviewed. (Id., p. 3.) Medical staff noted that Plaintiff had a "completely normal gait, no difficulty moving from standing position to sitting, vice versa, good ROM at least 95 degree flexion, full extension of the knee, and no obvious effusion." (Id.)

Plaintiff was examined by an orthopedist on October 10, 2012, who noted posterolateral rotary instability in the knee. (Id., p. 6.) The orthopedist indicated that this "particular instability is difficult to treat surgically" and recommended that Plaintiff use an ACL-type brace, such as a Cool-tron brace with "extension blocked at about 5-degrees." The orthopedist noted that this "will prevent the hyperextension problems." (Id.) The record reveals that medical staff at FCI Edgefield ordered the appropriate knee brace on same day. (Id., p. 4.) On January 17, 2013, Plaintiff reported to Health Services complaining that he hyperextended his knee while running on a treadmill. (Id., p. 8.) PA Ryan examined Plaintiff noting that he ambulated without a problem and was able to sit on the exam table with no problems. (Id.) PA Ryan advised Plaintiff to avoid running exercises and watch callout for his brace. (Id., p. 9.) On February 13, 2012, Plaintiff was seen by the orthopedic specialist for the purpose of fitting the knee brace. (Id., pp. 11 and 13.) The orthopedist specifically informed Plaintiff that was surgery was not necessary. (Id.) The orthopedist noted that he re-examined Plaintiff's right knee based upon Plaintiff's statement that he had re-injured his knee, but the ortheopedist "arrived with the same finding: posterolateral rotatory instability." (Id.)

On April 25, 2013, Plaintiff refused to be examined during his chronic care clinic visit for hypertension and right knee pain. (Id., pp. 14 and 16.) It was noted that Plaintiff had a "pronounced limp," but was "able to mount and dismount the exam table with ease and mild discomfort and

without assistance." (Id., p. 14.) The records reveals that Plaintiff's remaining medical records relate to a shoulder injury that occurred during a work out, a left knee injury that resulted from playing basketball in July 2013, and a left ankle injury that resulted from playing basketball in August 2013. (Id., pp. 17 - 52.)

### THE STANDARD

#### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

#### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-

moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

1.    **FTCA Claim:**

An inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

The FTCA, however, does not create a new cause of action. Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). The statute merely "permits the United States to be held liable in tort in the same

12

respect as a private person would be liable under the law of the place where the act occurred." Id.

In the present case, Plaintiff alleges that Defendants' negligent acts occurred in the State of West Virginia. Accordingly, West Virginia State law applies. Under West Virginia law, a plaintiff must satisfy certain prerequisites prior to filing suit against a health care provider. Specifically, a plaintiff must serve each defendant health care provider with a notice of claim with an attached screening certificate of merit executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence at least thirty (30) days prior to filing suit. W. Va. Code § 55-7B-6.[2] Compliance with West Virginia Code § 55-7B-6 is mandatory prior to filing suit in federal court. Stanley v. United States, 321 F.Supp.2d 805, 806-07 (N.D.W.Va. 2004); also see Starns v. United States, 923 F.2d 34 (4th Cir. 1991)(holding that Virginia's medical malpractice liability cap

---

[2] West Virginia Code § 55-7B-6 provides the following in pertinent part:

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of Rule 15 of the Rules of Civil Procedure.

13

applies to claims brought against the United States under the FTCA). West Virginia Code § 55-7B-6(c), however, provides that no screening certificate of merit is necessary where "the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care."

Plaintiff alleges that Defendants acted with negligence in providing medical treatment for his knee injury. In its Motion to Dismiss, the United States contends that Plaintiff's claim should be dismissed because he failed to timely and properly file a screening certificate of merit pursuant to the MPLA. (Document No. 25.) In Response, Plaintiff appears to argue that expert testimony is unnecessary. (Document No. 41.) Specifically, Plaintiff contends that "a lay person would, more than likely, feel that there would have been a need for plaintiff to see an orthopedist due to this previously fractured bone never having been medically addressed." (Id., p. 34.)

The Court first notes that Plaintiff's Exhibits B-8 and B-9 do not constitute a Certificate of Merit." (Document No. 41-1, pp. 17 - 22.) Plaintiff's above Exhibits are merely responses to medical questions submitted by Plaintiff to a physician from "JustAnswer.com." The undersigned, therefore, finds that Plaintiff's Exhibits fails to comply with the requirements of W. Va. Code § 55-7B-6(b). The undersigned, therefore, will consider whether expert testimony is necessary in the instant case. Under West Virginia law, "[i]t is the general rule that in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses." Syllabus Point 2, Roberts v. Gale, 149 W.Va. 166, 139 S.Ed.2d 272 (1964). Expert testimony, however, is not required "where the lack of care or want of skill is so gross as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience." Farley v. Shook, 218 W.Va. 680, 629 S.E.2d 739 (2006). The MPLA provides as follows concerning claims "based upon a well-established legal theory of liability":

> Notwithstanding any provision of this code, if a claimant or his or her counsel, believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

West Virginia Code § 55-7B-6(c). In <u>Johnson v. United States</u>, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. <u>Id.</u> The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." <u>Id.</u> at 858.

Unlike the facts in <u>Johnson</u>, Plaintiff's allegations of negligence are complex and expert testimony is necessary. <u>See</u> <u>O'Neil v. United States</u>, 2008 WL 906470 (S.D.W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience); <u>also see</u> <u>Giambalvo v. United States</u>, 2012 WL 984277 * 4 (N.D.W.Va. March 22, 2012)(finding that *Johnson* "is a rare exception to 'the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses.'"). In the instant case, it appears that Defendants examined Plaintiff's knee, ordered x-rays and an MRI, and provided medication. Plaintiff, however, contends that Defendants provided inadequate and delayed treatment, which resulted in him suffering unnecessary pain and made his "condition become difficult to treat

15

surgically." Expert testimony is necessary to support a finding that the medical treatment provided by Defendants fell below the applicable standard of care. Plaintiff's medical records reveal that Plaintiff suffered from an avulsion fracture, partial tear of the proximal aspect of the lateral collateral ligament, and posterolateral rotary instability in the right knee. The undersigned finds that what constitutes timely treatment, risk factors, symptoms, and appropriate treatment options for the above conditions are not within the understanding of lay jurors by resort to common knowledge and experience. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55-7B-6(c). The undersigned, therefore, recommends that the United States' Motion to Dismiss (Document No. 25) be granted.

**2.**     **Bivens Claim:**

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under Bivens must show the violation of a valid constitutional right by a person acting under

16

color of federal law.[3] The United States Supreme Court has held that an inmate may name a federal officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to Bivens. See Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). However, Bivens claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. See FDIC v. Meyer, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991); Reinbold v. Evers, 187 F.3d 348, 355 n. 7 (4th Cir. 1999).

### A.    Defendant Hill is entitled to absolute immunity.

In his Complaint, Plaintiff alleges that Defendant Hill improperly treated his right knee injury. (Document No. 2.) Defendant Hill argues that he was a United States Public Health Service employee and therefore is entitled to absolute immunity. (Document No. 34, pp. 12 - 13.) In support, Defendant Hill attaches his Declaration stating as follows: "I was a Commissioned Officer with the United States Public Health Service ("PHS") beginning on December 2, 2011, and remained a Commissioned Officer until April 9, 2013, when I left the PHS." (Document No. 35-3, p. 53.)

---

[3] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may assert claims of personal liability against individual prison officials for violations of their constitutional rights but may not assert claims against the government or prison officials in their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72, that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

Plaintiff fails to respond to Defendant Hill's above argument. (Document No. 41.)

> Title 42 U.S.C. § 233(a) provides as follows:
>
> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 . . . for damages for personal injury, including death, resulting from the performance of medical, surgical, dental or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

Thus, Congress made proceedings under the Federal Tort Claims Act the sole avenue to seek relief against a Public Health Service employee for injuries resulting from the employee's performance of medical functions within the scope of his or her employment. Recently, the United States Supreme Court held that "[t]he immunity provided by § 233(a) precludes *Bivens* actions against individual [Public Health Service] officers or employees for harms arising out of constitutional violations committed while acting within the scope of their office or employment." Hui v. Castaneda, 559 U.S. 799, 130 S.Ct. 1845, 1847, 176 L.Ed.2d 703 (2010)(stating that Section 233(a) "plainly precludes a *Bivens* action against petitioners by limiting recovery for harms arising from the conduct at issue to an FTCA action against the United States.") Defendant Hill held the position of a Physician Assistant at FCI McDowell. Thus, Plaintiff alleges that Defendant Hill is responsible for failing to provide appropriate medical care. Defendant Hill was clearly acting within the scope of his employment when performing functions pertinent to his position, such as providing medical care to Plaintiff. Based on the foregoing, the Court finds that Defendant Hill was a Commissioned Officer in the United States Public Health Service during the time period relevant to this Complaint and has absolute immunity from suit for all claims arising from the medical care he provided to Plaintiff.

18

**B.**     **Plaintiff's claims against Defendant Hogsten.**

In his Complaint, Plaintiff appears to contend that Defendant Hogsten violated his constitutional rights by failing to ensure that he received proper medical treatment. (Document No. 2.) Specifically, Plaintiff contends that Defendant Hogsten acted with deliberate indifference by failing to provide physical therapy and misleading him to believing that he would get physical therapy at another institution.

In her Motion, Defendant Hogsten contends that "Plaintiff's claim against [her] does not allege a constitutional violation." (Document No. 36, p. 13.) First, Defendant Hogsten argues that Plaintiff's claim that she misled him into believing he would receive physical therapy at another institution does not allege a constitutional violation. (Id., pp. 13.) Next, Defendant Hogsten claims that "Plaintiff is referring to an administrative remedy response to his grievance wherein he was requesting an orthopedic consult and physical therapy." (Id., p. 14.) Defendant Hogsten states that her "response to Plaintiff's administrative remedy grievance about medical issues as based upon information from the medical department." (Id.) Thus, Defendant Hogsten contends that "[t]he administrative remedy response signed by Warden Hogsten is in no way personal involvement by the former Warden into Plaintiff's medical care." (Id.) Finally, Defendant Hogsten argues that Plaintiff names her as a defendant based upon her previous supervisory position as Warden, and she should be dismissed. (Id., pp. 23 - 24.)

In Response, Plaintiff argues that Defendant Hogsten responded to his administrative remedy stating that Plaintiff "was being put in for a transfer where the physical therapy 'service' could be provided because it was not offered at FCI McDowell (a care level 1 facility)." (Document No. 41, p. 21.) Plaintiff contends that this response was "nothing but a ploy to mislead plaintiff." (Id., p. 22.) Plaintiff argues that Defendant Hogsten was personally involved because she "personally reviewed

Plaintiff's medical records" when responding to his administrative remedy request. (Id.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 129 S.Ct. at 1948("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Also see Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

Defendant Hogsten argues that Plaintiff has failed to demonstrate how she was personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendant Hogsten violated his constitutional rights with respect to her failure to supervise employees and in responding to his administrative remedy. The evidence of record reveals that Defendant Hogsten responded to an administrative remedy request filed by Plaintiff. Specifically, Defendant Hogsten responded, in pertinent part, as follows:

The PA saw you on May 3, 2012, and explained the results of your recent MRI with

> you and wrote a consult for physical therapy. Due to physical therapy not being available at a Care Level 1 facility your care level has been increased to a Care Level 2 and you will be put in for a transfer where this service can be provided. The PA and the CD both concluded that according to your MRI the injuries are healed and there is no indication to see an orthopedist.

(Document No. 35-1, pp. 4 - 5.) Plaintiff, however, has shown no other personal involvement by Defendant Hogsten. The dismissal of a non-medical defendant is appropriate where the defendant's sole involvement is the denial of an administrative remedy request. See Fellove v. Heady, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state Bivens claim"); Mabry v. Ramirez, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a Bivens claim for deliberate indifference to serious medical needs"); Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003), aff'd, 70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Born, 896 F.2d 848, 854 - 55 (4th Cir. 1990). In her Declaration, Defendant Hogsten states as follows:

> 5.    The administrative remedy response was based solely upon the information provided by the FCI McDowell medical department, not based upon any personal involvement by me into his medical treatment. The response did not

21

promise him that he would receive any particular type of medical care. What was indicated was that his care level was already increased and that he would be put in for a transfer to a care level two facility where the service could be provided. In fact, this is exactly what happened. He was transferred to FCI Edgefield, a care level two facility. Whether the medical staff at the facility would later determine physical therapy was necessary or not was not a medical determination made by medical staff there, not by me.

6.     As the former Warden, I did not make medical decisions about the care of inmates. I relied upon my medical staff to make medical decisions regarding the type of medical care that was appropriate for inmates in my custody.

7.     Furthermore, I did not get involved in determining what type of medical care an inmate would need at any other facility.

(Id., pp. 56 - 57.) Thus, the undersigned finds there is no evidence that Defendant Hogsten was personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the medical staffs' conduct. Accordingly, the Court therefore finds that Defendant Hogsten's Motion to Dismiss, or in the Alternative Motion for Summary Judgment should be granted. The undersigned finds it unnecessary to consider the other reasons which the Defendant Hogsten has submitted for dismissal.

**C.    No evidence of deliberate indifference.**

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337,

347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

  To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

  To establish that a health care provider's actions constitute deliberate indifference to

a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

24

Plaintiff alleges that Defendants Goode, Hill,[4] and Matos acted with deliberate indifference in providing medical treatment for his knee injury. For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. Plaintiff alleges that his knee condition caused continuous pain. Accordingly, the undersigned will assume for purposes of this motion that Plaintiff's knee condition was serious enough to give rise to an Eighth Amendment claim.

Next, the undersigned will consider whether Defendants Goode, Hill, and Matos acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends that Defendants acted with deliberate indifference in failing to timely order an MRI and not referring him to an orthopedic physician for evaluation. Plaintiff first notified Health Services of his knee injury on September 21, 2011. Plaintiff was examined by PA Goode, who noted that Plaintiff had full range of motion with some swelling, effusion, and crepitus. PA Goode prescribed prednisone, ordered an x-ray, and instructed Plaintiff to follow-up at sick call as needed. The x-ray was conducted approximately two weeks later and revealed negative findings "except for small joint effusion and mild prepatellar soft tissue swelling." On October 21, 2011, Dr. Matos examined Plaintiff's knee during a chronic care appointment, reviewed the x-ray results, and prescribed Indomethacin for the inflammation and pain. Approximately three months later, PA Goode noted that Plaintiff's continued to complain of knee

---

[4] Although the undersigned has determined that Defendant Hill is entitled to absolute immunity, the undersigned will also consider whether Defendant Hill acted with deliberate indifference.

25

pain and submitted a consultation request to the URC for an MRI. On February 24, 2012, Plaintiff

was evaluated by PA Hill for a follow-up appointment and Plaintiff notified PA Hill that he had re-

injured his knee while playing softball. PA Hill examined Plaintiff noting a favoring gait with

swelling, tenderness, and clicking of the right knee. PA Hill noted that the MRI request was pending,

and an orthopedic consult could be considered if the MRI was not approved. Approximately three

weeks later, PA Hill examined Plaintiff during a follow-up appointment noting that Plaintiff had a

normal gait and the MRI request was pending regional approval. Plaintiff was examined by Dr. Matos

during a chronic care visit on April 4, 2012, who noted that Plaintiff had some tenderness when

bending his right knee. Dr. Matos further noted Plaintiff's lack of compliance with the prescribed

medication for knee pain and instructed Plaintiff to continue the prescription for Indomethacin for

knee pain. An MRI of Plaintiff's right knee was conducted on April 9, 2012, and a second x-ray was

conducted on April 17, 2012. The x-ray was "negative except for: prominence of the prepatellar soft

tissue; cannot exclude prepatellar bursitis." The MRI report dated April 19, 2012, indicated an "old

healed avulsion fracture from the lateral aspect of the lateral femoral condyle associated with an old

partial tear of the proximal aspect of the lateral collateral ligament," and "mild irregular articular

cartilage thinning in the central portions of both femoral condyles." Approximately two weeks later,

PA Hill discussed the MRI results with Plaintiff and submitted an URC request for physical therapy.

On May 17, 2012, the URC denied the request for physical therapy because FCI McDowell is a Care

Level 1 facility in a remote location. Subsequently, Plaintiff's Care Level was increased to a Care

Level 2. Plaintiff was transferred from FCI McDowell on July 19, 2012, and arrived at FCI Edgefiled,

a Care Level 2 facility, on August 8, 2012.

     The Court finds that Defendants Goode, Hill, and Matos did not act with deliberate

indifference in providing medical treatment regarding Plaintiff's knee injury. The record reveals that

26

Defendants evaluated Plaintiff and provided treatment following each sick-call request and chronic care visit. Defendants consistently evaluated Plaintiff's condition, ordered x-rays and an MRI, prescribed pain medications, issued medical restrictions, and submitted an URC request for physical therapy. Plaintiff first contends that Defendants were deliberate indifferent because physical therapy was necessary to rehabilitate his knee. The record reveals, however, that PA Hill clearly submitted a consult request for physical therapy but the request was denied because FCI McDowell is a Care Level 1 facility and physical therapy was not available. Plaintiff's Care Level was subsequently increased to two, and he was transferred to a Care Level 2 facility where physical therapy could be provided.[5] Next, Plaintiff contends that Defendants improperly delayed the ordering of an MRI and failed to refer him to an orthopedic doctor. There is no evidence, however, that Defendants knowingly disregarded the need for an MRI or a referral to an orthopedic doctor. Although a consult request for an MRI was not submitted for approximately four months after Plaintiff's knee injury, the record reveals that examinations of Plaintiff's knee revealed a good range of motion with only mild swelling. Thus, there is no evidence that the four month delay in ordering an MRI constituted deliberate indifference. Finally, Defendants' decision not to refer Plaintiff to an orthopedic doctor did not result in deliberate indifference. After reviewing Plaintiff's MRI results that revealed an "old healed avulsion fracture . . . of the femoral condyle" and an "old partial tear of the . . . lateral collateral ligament," Defendants determined that physical therapy was the appropriate treatment. Plaintiff appears to argue that a referral was necessary because he was referred to an orthopedic doctor by medical staff at FCI Edgefield. The record, however, reveals that the only additional

---

[5] To the extent Plaintiff is asserting medical staff at FCI Edgfield failed to provide physical therapy, such a claim is not properly before this Court.

27

treatment the orthopedic doctor recommended was the use of a knee brace.[6] At most, Defendants may have been negligent in failing to order the use of a knee brace. It is well recognized that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." Webb v. Hamidullah, 281 Fed.Appx. 159, 166 (4th Cir. 2008); also see Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

Finally, an inmate's disagreement with his medical care for an objectively serious medical injury generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Plaintiff appears to argue that Defendants provided improper medical treatment based upon two responses he received from JustAnswer.com. (Document No. 41, pp. 17 - 22.) As Exhibits, Plaintiff attaches a copy of two responses to his online inquiries submitted to JustAnswer.com. (Id.) Plaintiff notes that the "Board Certified physician in Internal Medicine" suggested a knee immobilizer and use of crutches as the initial treatment for Plaintiff's knee injury. (Id., p. 17.) Plaintiff notes that in response to his follow-up question regarding treatment 17 months after injury, the online physician recommended "surgery, arthroscopic or otherwise, after a possible MRI to definitively diagnose what's going on so the options can be discussed with you." (Id., p. 21.) The undersigned, however, finds that the mere disagreement of opinions by physicians does not establish deliberate indifference. Vanderhart v. Felts, 2012 WL 727647, * 13 (S.D.W.Va. Feb. 15, 2012); also see Thomas v. O'Haver, 142 F.3d 440, * 4 (7th Cir. 1998)(unpublished

---

[6] Plaintiff appears to argue that the orthopedic doctor initially recommended surgery. The record, however, reveals that the orthopedic doctor advised Plaintiff that his condition was "difficult to treat surgically." (Document No. 35-2, p. 6.) Plaintiff appears to misconstrue the orthopedic doctor's statement that his condition was "difficult to treat surgically" as meaning he needed surgery. During a subsequent appointment, the orthopedic doctor specifically advised Plaintiff was surgery was not necessary. (Document No. 35-2, pp. 11 and 13.)

opinion)("Physicians will disagree about whether a particular course of treatment is appropriate, or even if treatment is appropriate at all, but a disagreement in treatment alone will not support a constitutional violation."); Hanson v. Smith, 9 F.3d 1557, * 2 (10th Cir. 1993)(unpublished opinion)("Even should medical opinions differ among prison doctors, such a difference of opinion does not support a claim of cruel and unusual punishment."); Cerilli v. Rell, 2010 WL 3827960, * 6 (D.Conn. Sept. 23, 2010)("Physicians can and do differ in their diagnoses and their determinations of the appropriate treatment for a particular patient, and the mere existence of a difference of opinion does not establish a claim of deliberate indifference."); Cole v. Goord, 2009 WL 1181295, * 8 n. 9 (S.D.N.Y. Apr. 30, 2009)(Plaintiff's "reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment . . . does nothing to establish that [defendant] violated [Plaintiff's] Eighth Amendment rights.") Thus, Plaintiff merely disagrees with the appropriate course of treatment. "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." Malcomb v. Raja, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation.") Accordingly, the undersigned finds that Defendants Goode, Hill, and Matos did not act with deliberate indifference in providing medical treatment for Plaintiff's knee injury. The undersigned finds it unnecessary to consider the other reasons which the Defendants have submitted for dismissal.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that

29

the District Court **GRANT** the United States' "Motion to Dismiss Plaintiff's FTCA Claim" (Document No. 25.), **GRANT** Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment) (Document No. 35.) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have seventeen (17) days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Faber and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: November 25, 2014.

R. Clarke VanDervort
United States Magistrate Judge